Filed 7/30/18 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2018 ND 189

North Dakota Legislative Assembly, 

Senator Ray Holmberg, Representative Al 

Carlson, Senator Rich Wardner, Senator 

Joan Heckaman, and Representative 

Corey Mock, Petitioners and Cross-Respondents

v.

North Dakota Governor Doug Burgum, Respondent and Cross-Petitioner

and

North Dakota Attorney General Wayne K.

Stenehjem, Cross-Petitioner

No. 20170436

Petition for Declaratory Judgment, or in the Alternative, for Writ of Mandamus, and Cross-Petition for Declaratory Judgment.

LEGAL STATUS DECLARED.

Opinion of the Court by Tufte, Justice.

Shawn A. Grinolds (argued) and Randall J. Bakke (appeared), Bismarck, N.D., for petitioners.

Wayne K. Stenehjem (argued), Attorney General, and James E. Nicolai (appeared), Deputy Solicitor General, Bismarck, N.D., for respondent.

N.D. Legislative Assembly v. Burgum

No. 20170436

Tufte, Justice.

[¶1] The Legislative Assembly, joined by individual legislators consisting of the leaders of the senate and the house of representatives and of the legislative management committee, petitioned this Court to exercise our original jurisdiction to determine the constitutionality of five partial vetoes issued by Governor Doug Burgum.  Governor Burgum, joined by Attorney General Wayne Stenehjem, cross-petitioned seeking judgment declaring unconstitutional the provisions in two bills which condition the spending or transfer of certain appropriated funds upon approval of a legislative committee.

I.

[¶2] After adjournment of the Regular Session of the 65th Legislative Assembly, the Governor vetoed five items in four appropriation bills by striking through certain language in the bills before signing them into law.  In an opinion requested by Senator Rich Wardner and Representative Al Carlson, the Attorney General concluded three of the partial vetoes were ineffective:  Senate Bill 2003, § 18, subsection 3 (“Any Portion Veto”); House Bill 1020, § 5 (“Water Commission Veto”); and Senate Bill 2013, § 12 (“IT Project Veto”).  N.D. Op. Att’y Gen. 2017-L-04 (June 19, 2017).  The Attorney General stated that these partial vetoes were ineffective because they exceeded the Governor’s constitutional authority by attempting to veto a condition on an appropriation without vetoing the appropriation itself.  The Attorney General further stated that, although the Water Commission Veto and IT Project Veto were ineffective, a court would conclude the vetoed language is unconstitutional under the separation of powers doctrine.

[¶3] The Legislative Assembly petitions for a declaratory judgment voiding the five partial vetoes and declaring that the bills, without the challenged vetoes, are the current law.  Alternatively, if a declaratory judgment is not granted, the Legislative Assembly seeks a writ of mandamus compelling the Governor to treat the partial vetoes as a nullity.  The Governor and the Attorney General cross-petition for a declaratory judgment stating that the budget section provisions stricken by the Water Commission Veto and the IT Project Veto are unconstitutional in violation of the non-delegation and separation of powers doctrines.

II.

[¶4] The Legislative Assembly petitions this Court to exercise its original jurisdiction to void five partial vetoes; the Governor cross-petitions this Court to exercise our original jurisdiction to rule on his cross-petition seeking declaratory judgment.  We have “original jurisdiction with authority to issue, hear, and determine such original and remedial writs as may be necessary to properly exercise [our] jurisdiction.”  N.D. Const. art. VI, § 2.  It is well-settled that we invoke our original jurisdiction “only in cases 
publici juris
 and those affecting the sovereignty of the state, its franchises and prerogatives, or the liberties of its people.”  
State v. Nelson County
, 1 N.D. 88, 101, 45 N.W. 33, 38 (1890); 
N.D. State Bd. of Higher Ed. v. Jaeger
, 2012 ND 64, ¶ 11, 815 N.W.2d 215; 
State ex rel. Link v. Olson
, 286 N.W.2d 262, 266 (N.D. 1979).  Even upon proper showing, original jurisdiction is always discretionary, and the Court determines for itself whether a matter is within its original jurisdiction.  
Olson
, 286 N.W.2d at 266.

[¶5] We have exercised our original jurisdiction to determine the constitutionality of a partial veto and the constitutionality of a legislative assignment of duties to the lieutenant governor:

In this case the governor contends that the legislative branch has infringed upon the authority granted to him by the North Dakota Constitution to assign duties to the lieutenant governor.  The case also involves the extent of the power of the governor to partially veto a bill.  The constitutionality of legislative action which appears to change the scope and function of the office of lieutenant governor is involved.  These are issues of public concern as they affect not only the elected officials who are directly involved, but also the delicate balance of powers between the legislative and executive branches of government. Accordingly, we hold this to be a proper case for this court to exercise its original jurisdiction.

Id.
; 
see also
 
State ex rel. Peterson v. Olson
, 307 N.W.2d 528, 531 (N.D. 1981) (exercising original jurisdiction over “challenges relat[ing] to the very foundation upon which the executive and legislative branches of government rest”).

[¶6] The Governor argues that none of the challenges to his partial vetoes involve a justiciable controversy.  A claim may be non-justiciable if a party lacks standing, 
Whitecalfe v. North Dakota Dep’t of Transp.
, 2007 ND 32, ¶ 15, 727 N.W.2d 779, the claim is moot, 
Brandvold v. Lewis and Clark Pub. Sch. Dist.
, 2011 ND 185, ¶¶ 9-11, 803 N.W.2d 827, or if the answer would be advisory, 
Richland Cty. Water Res. Bd. v. Pribbernow
, 442 N.W.2d 916, 918-19 (N.D. 1989).  The Legislative Assembly has standing to bring otherwise justiciable claims seeking to defend against executive branch encroachment into the legislative sphere through improper use of a partial veto.  
See
 
Colorado General Assembly v. Lamm
, 704 P.2d 1371, 1378-79 (Colo. 1985).

[¶7] The Governor argues that the challenge to the partial veto of Senate Bill 2003, § 39 (“Credit Hour Veto”) does not present a justiciable controversy because the vetoed phrase in a statement of legislative intent already lacked legal significance.  The Legislative Assembly cannot restrict a subsequent legislative assembly from appropriating funds through a statement of intent.  
State v. Blaisdell
, 18 N.D. 55, 68, 118 N.W. 141, 147 (1908) (rejecting argument that a statute binds future legislatures because “each Legislature has plenary power when not restricted by the state or federal Constitutions, and hence may repeal the entire primary law at any time”); 
Opinion of the Justices
, 79 A.2d 753, 756 (Me. 1951) (stating that “one Legislature cannot impose a legal obligation to appropriate money upon succeeding Legislatures”); 
Ex parte Collie
, 240 P.2d 275, 276 (Cal. 1952) (“It is the general rule that one legislative body cannot limit or restrict its own power or that of subsequent Legislatures and that the act of one Legislature does not bind its successors.”).  Thus, the Governor argues, because Section 39 holds no legal significance, a justiciable controversy does not exist.  The Legislative Assembly asserts the Governor may not alter a statement of legislative intent by using a partial veto to remove a phrase.  Whatever its practical effect here, whether a legislative statement of intent is subject to editorial revision by the Governor through partial veto is neither moot nor advisory and raises a potential for modification of legislative intent having a variety of effects.  The Credit Hour Veto raises a justiciable controversy.

[¶8] The Governor contends that the veto of Senate Bill 2018, § 12 (“Workplace Safety Veto”) is non-justiciable because the challenge is premised on an agency bookkeeping error that has since been corrected and an incorrect assertion by the Legislative Assembly that the source of the funds is not ascertainable.  The Governor argues that the Workplace Safety Veto is non-justiciable because he acknowledges the $2,250,000 appropriation must be reduced by $300,000 and the $300,000 must remain in the research North Dakota fund subject to any other conditions placed on that fund.  These arguments are more properly considered as going to the merits of the claim rather than justiciability.  Whether the veto was effective and, if so, what was the legal effect of the veto are justiciable matters.

[¶9] The Governor argues that because he agrees with the Attorney General’s conclusion that the Any Portion Veto, Water Commission Veto, and IT Project Veto were ineffective, no actual and justiciable controversy exists.  The Governor contends that we would merely be issuing an advisory opinion.  The Legislative Assembly argues that because an attorney general opinion is not binding law, 
see
 
Sorum v. Dalrymple
, 2014 ND 233, ¶ 10, 857 N.W.2d 96, it cannot negate a gubernatorial veto.  N.D. Const. art. V, § 9 (“Portions of the bill not vetoed become law.”).  Under the constitution, a veto is either effective when made or it exceeds the Governor’s authority and is a legal nullity.  
State ex rel. Sandaker v. Olson
, 65 N.D. 561, 567, 260 N.W. 586, 588 (1935).  We hold the Governor has no power to withdraw a veto, nor may he reach that result by agreeing with an attorney general opinion that a veto exceeded constitutional limits.  To conclude otherwise would leave the law in an indeterminate state subject to the discretion of the Governor and Attorney General.  Because an unauthorized veto has no effect, if the Governor exceeded his constitutional authority, the bills with ineffective vetoes became law in their entirety.  N.D. Const. art. V, § 9; 
Olson
, 286 N.W.2d at 272-73.

[¶10] Similar to 
Olson
, the issues in this case involve the constitutionality of partial vetoes and the limits of the legislature’s power as it approaches the powers properly exercised by the executive branch.  These issues concern the balance of powers between the legislative and executive branches of government.  
See
 The Federalist No. 48 (James Madison).  Because our constitution provides for a separation of legislative, executive, and judicial powers, actions which tend to undermine this separation are of great public concern.  The petition and cross-petition present justiciable controversies of significant public interest that justify exercise of our original jurisdiction.

III.

[¶11] The Legislative Assembly seeks declaratory judgment declaring void five partial vetoes, leaving as current law the bills without the vetoes.  The Governor concedes three of the partial vetoes were ineffective but argues two were within his veto authority.  Because these are all justiciable claims, we reach the merits on all contested vetoes despite the Governor’s concession.

[¶12] The Governor’s veto authority is derived from N.D. Const. art. V, § 9, which provides, in relevant part:

Every bill passed by the legislative assembly must be presented to the governor for the governor’s signature.  If the governor signs the bill, it becomes law.

The governor may veto a bill passed by the legislative assembly.  The governor may veto items in an appropriation bill.  Portions of the bill not vetoed become law.

Section 9 was enacted as part of a new Article V, which became effective July 1, 1997.  1997 N.D. Sess. Laws ch. 568, §§ 9, 14.

[¶13] In 
Olson
, we interpreted a previous constitutional provision granting the governor veto authority.  At that time, the constitution provided:

The governor shall have power to disapprove of any item 
or items or part or parts of any bill making appropriations of money or property embracing distinct items
, and the part or parts of the bill approved shall be the law, and the item or items and part or parts disapproved shall be void, unless enacted in the following manner: . . .

286 N.W.2d at 268 (quoting N.D. Const. § 80 (repealed eff. July 1, 1997)).  The purpose of Section 80 was to prevent logrolling, “the practice of attaching riders of objectionable legislation to general appropriation bills in order to force the governor to veto the entire bill or approve the act with the objectionable parts intact.”  Id. at 269.  In interpreting Section 80, we held:

that the governor, in exercising his partial veto power, may only veto items or parts in appropriation bills that are related to the vetoed appropriation and are so separate and distinct that, after removing them, the bill can stand as workable legislation which comports with the fundamental purpose the legislature intended to effect when the whole was enacted.  He may not veto conditions or restrictions on appropriations without vetoing the appropriation itself.

Id.
 at 270-71.

[¶14] Formerly, the Governor could veto “any item or items or part or parts.”  Now, the Governor “may veto items.”  To whatever extent a “part” was distinct from an “item,” the partial veto power would be narrowed to that extent.  The parties have not provided a substantive reason for this textual alteration, and we have found none.  The available evidence suggests the voters who approved the amended provision intended to simplify rather than narrow the provision.  
See
 N.D. Op. Att’y Gen. 2001-F-04, at 5 fn. 5 (May 8, 2001).  Accordingly, the analysis in 
Olson
 is unaffected by the amendment.  Changing the language from “item or items or part or parts,” N.D. Const. § 80 (repealed eff. July 1, 1997), to “items,” N.D. Const. art. V, § 9, has not changed the plain meaning of the Constitution.  Thus, the Governor can veto “items in an appropriation bill” if what remains is workable legislation, but cannot veto conditions on an appropriation unless the appropriation is also vetoed.  
See
 
Olson
, 286 N.W.2d at 270-71.

[¶15] An “item” subject to partial veto includes a specified sum of money designated for a particular purpose.  
Sandaker
, 260 N.W. at 589 (approving of “item” definition provided in 
Fairfield v. Foster
, 214 P. 319 (Ariz. 1923)).  An “item” may be vetoed in its entirety, but it may not be reduced or scaled.  
See
 
id.
  If the “item” is an appropriation included in a larger subdivision or otherwise aggregated into a larger appropriation, the effect of an item veto is to subtract the item from the larger total.  
Id.
 at 587.  “The purpose [of the item veto] is to prevent, if possible, the adoption of omnibus appropriation bills, logrolling, the practice of jumbling together in one act incongruous subjects in order to force a passage by uniting minorities with different interests when the particular provisions could not pass on their separate merits.”  
Id.
 at 589.  This is consistent with the requirement that “[n]o bill may embrace more than one subject.”  N.D. Const. art. IV, § 13.  We apply this long-established definition of “item” to each veto below.

A. Workplace Safety Veto

[¶16] Senate Bill 2018, § 12, provides:

SECTION 12.  ENTREPRENEURSHIP GRANTS AND VOUCHER PROGRAM - EXEMPTION.  Section 1 of this Act includes the sum of $2,250,000, of which $600,000 is from the general fund and $1,650,000 is from special funds, for an entrepreneurship grants and voucher program to be developed and administered by the department of commerce, for the biennium beginning July 1, 2017, and ending June 30, 2019.  Of the amount appropriated, $900,000 is to be distributed equally to entrepreneurial centers located in Bismarck, Fargo, and Grand Forks, 
$300,000 to an organization that provides workplace safety
, and $300,000 for biotechnology grants.  The department shall establish guidelines to provide grants to entrepreneurial centers certified by the department.  The department also shall establish guidelines to award vouchers to entrepreneurs to procure business development assistance from certified entrepreneurial centers or to provide grants to entrepreneurs working with an entrepreneurial center.  The amount appropriated for entrepreneurship grants in section 1 of this Act is not subject to section 54-44.1-11 and any unexpended funds from this line item are available during the biennium beginning July 1, 2019, and ending June 30, 2021.

S.B. 2018, § 12, 65th Legis. Assemb., Reg. Sess. (N.D. 2017) (emphasis added).  The Governor vetoed the language “$300,000 to an organization that provides workplace safety.”  2017 N.D. Sess. Laws ch. 452.

[¶17] The Legislative Assembly argues that the Workplace Safety Veto struck a condition of the appropriation, without also striking the appropriation itself, and thus was invalid under 
Olson
.  The Governor argues the veto was of a separate and distinct appropriation and thus was valid because it struck both the appropriation and the related condition.  The core disagreement is whether spending $300,000 on workplace safety is a condition on the $2,250,000 appropriation or whether the $300,000 is a component item of the larger appropriation.

[¶18] “The governor may veto items in an appropriation bill.”  N.D. Const. art. V, § 9.  An appropriation is the “setting apart from the public revenue of a definite sum of money for the specified object in such a manner that the officials of the government are authorized to use the amount so set apart, and no more, for that object.”  
Olson
, 286 N.W.2d at 268.  There is no dispute that S.B. 2018 is an appropriation bill, thus any “items” in the bill are subject to the Governor’s item veto power.

[¶19] Senate Bill 2018, § 12, set apart from the public revenue the definite sum of $300,000 for the specified object of an entrepreneurship grant to an organization that provides workplace safety.  The Legislative Assembly asserts three arguments that this veto was of a condition.  First, the Legislative Assembly argues that because the $300,000 was not subtracted from the total appropriated funds ($2.25 million), 
see
 S.B. 2018, §§ 1, 12, 65th Legis. Assemb., Reg. Sess. (N.D. 2017), the Governor retained the $300,000 to use at his discretion.  
See
 
Colorado General Assembly v. Owens
, 136 P.3d 262, 267 (Colo. 2006) (“
Owens
”) (“If the Governor were able to veto an individual item contained within the larger overall appropriation without reducing the overall appropriation by the amount of the vetoed item, the Governor could thereby remove any legislative condition as to how that money could be spent.”).  The Legislative Assembly contends that the Workplace Safety Veto had the intent and effect of eliminating the condition on the $2.25 million total appropriation (that $300,000 be distributed to an organization that provides workplace safety) without reducing the total appropriation by $300,000.

[¶20] For support, the Legislative Assembly cites 
Owens 
and 
Rush v. Ray
, 362 N.W.2d 479 (Iowa 1985).  In 
Owens
, the Colorado governor vetoed definitional headnotes in appropriation bills, such as “capital outlay,” “lease space,” and “operating expenses.”  136 P.3d at 264.  The Supreme Court of Colorado held that the headnotes were not “items” because “they are not sums of money, and they cannot be eliminated without affecting the other purposes or provisions of the long bill.”  
Id.
 at 267.  The headnote veto was beyond the scope of the Colorado governor’s item veto power because the headnotes defined terms used throughout the bill and thus were legally interdependent with other parts of the bill.  
Id.
  Here, the effect of the Workplace Safety Veto was to eliminate a discrete sum of money not legally interdependent with the rest of the bill.

[¶21] In 
Rush
, the Iowa governor vetoed provisions in appropriation bills that stated “funds appropriated by this Act shall not be subject to transfer or expenditure for any purpose other than the purposes specified.”  362 N.W.2d at 480.  The Supreme Court of Iowa held that the vetoes were of qualifications on the appropriations, rather than separate items, and thus not subject to the governor’s veto power.  
Id.
 at 483.  This too is distinguishable because the vetoes in 
Rush
 struck a condition on appropriated funds but did not also strike the appropriation of money.  
See
 
Olson
, 286 N.W.2d at 270-71 (holding that conditions can be vetoed only if the appropriation itself is vetoed).

[¶22] The Workplace Safety Veto is in accord with the longstanding practice in North Dakota.  The first partial vetoes were in 1903, after the legislature passed S.B. 22, which appropriated $144,550 to the State Hospital in Jamestown for the payment of expenses.  
Olson
, 286 N.W.2d at 271; 1903 N.D. Sess. Laws ch. 17, § 1.  The governor approved S.B. 22, “except the item appropriating four thousand dollars for beds, bedding and furniture . . . .”  1903 N.D. Sess. Laws ch. 17.  This item was one of several items comprising the total appropriation of $144,550.  The 1903 vetoes illustrate that from the early days of statehood it was understood that the subtraction of vetoed items from larger totals was the legal result of an item veto.  If accepted, the Legislative Assembly’s challenge to the Workplace Safety Veto would invalidate how the state’s governors have used the item veto power for more than a century.

[¶23] In
 Sandaker
, the legislature passed a bill that contained twelve items, including the amounts of $6,960 for the salaries of assistant dairy commissioners and $3,584 for the salary of the dairy commissioner, among others.  260 N.W. at 587.  The governor vetoed all the items, except for the dairy commissioner’s salary.  
Id.
  We stated that the governor

did not reduce, or pare, or scale, any of these to make an item less than what the Legislature made.  He struck out the items entirely.

. . . It is true he said the total appropriation was reduced to $3,584 by his act; but this is immaterial.  This was merely his answer to a problem in subtraction.  The fact is, he disapproved of each of the items in that subdivision except the item of $3,584.  The effect of this was to cut the appropriation for that department to $3,584.

Id.
  Here, the Governor struck out the item of $300,000 in its entirety.  The total appropriation for entrepreneurship grants and vouchers, $2.25 million, was not modified by the Governor because the veto power does not include the power to insert words or numbers.  The veto power is an eraser, not a pencil.  The Governor may strike words or numbers in a bill, but he may not insert them.  
Id.
; 
see
 
State ex rel. Wisconsin Senate v. Thompson
, 424 N.W.2d 385, 388 (Wis. 1988).  The Legislative Assembly’s argument would permit its strategic drafting to protect an individual appropriation from veto, because vetoing an individual item would not subtract the vetoed amount from the total amount appropriated.  According to the Legislative Assembly, this amount remains appropriated and could be spent at the Governor’s discretion, which it argues is a result beyond the Governor’s veto power.  The balance of power would be upset if simply bundling together items in an appropriation bill could effectively eliminate the Governor’s item veto authority.  Although the Governor lacks the power to alter the mathematical calculations that result from vetoed items, any vetoed items are as a matter of law subtracted from any larger amount in which they are included.  
Sandaker
, 260 N.W. at 587.

[¶24] Second, the Legislative Assembly argues that Section 1, Senate Bill 2018, provides for the appropriation and Section 12 provides for the conditions placed on that appropriation.  For support the Assembly cites the North Dakota Legislative Drafting Manual 2017, which provides sample appropriation language similar to Section 1.  
Compare
 S.B. 2018, § 1, 
with North Dakota Legislative Drafting Manual
 18 (2017).  Further, the Assembly emphasizes that Section 1 is titled “Appropriation” and incorporates appropriation language; whereas, Section 12 refers to “[t]he amount appropriated for entrepreneurship grants in section 1 of this Act . . . .”

[¶25] Although Section 1 contains traditional appropriation language, this does not preclude a conclusion that Section 12 also contains items making an appropriation or providing necessary definition to an appropriation.  To conclude otherwise would permit sheltering certain items from a veto by providing for them in any other section other than the traditional appropriation section, Section 1.  The Legislative Drafting Manual is a tool for structural consistency, but it does not aid us in determining what is an item subject to veto.  Whether or not documented in the Legislative Drafting Manual, structuring an appropriation bill with one large appropriation subject to various conditions specifying individual items on which it shall be spent will not insulate a specified sum allocated to a specified purpose from the item veto.  To reject this argument, one need only consider the possibility of an omnibus bill making a single appropriation for the executive branch subject to numerous conditions as to how various included amounts must be spent.  
See
 
Fairfield v. Foster
, 214 P. 319, 323 (Ariz. 1923) (“If this construction be upheld, obviously the next step for a Legislature hostile to a future Governor will be a further consolidation of the ‘items’ of the appropriation bill, with a ‘direction’ of how the money shall be spent, until the special veto is practically abolished.”).

[¶26] Third, the Legislative Assembly argues that because the source of the funding cannot be ascertained, the $300,000 cannot be deemed an item of appropriation.  
See
 
Owens
, 136 P.3d at 267 (quotation omitted) (stating that “the source of funding is as much a part of an item of appropriation as the amount of money appropriated and the purpose to which it is to be devoted, and so it could not be removed through the item veto power”).  Here, Section 12 provides, “Section 1 of this Act includes the sum of $2,250,000, of which $600,000 is from the general fund and $1,650,000 is from special funds.”  The Legislative Assembly argues that the $300,000 must be a condition because the exact source (general fund or special funds) cannot be determined, and thus the Workplace Safety Veto could not have been of an item of appropriation.  We disagree.  Section 14 of the same bill, Senate Bill 2018, states that the source of the $300,000 is the research North Dakota fund.  Section 14 provides:

SECTION 14.  ESTIMATED INCOME - RESEARCH NORTH DAKOTA FUND.  Notwithstanding section 54-65-08, the estimated income line item in section 1 of this Act includes $3,500,000 from the research North Dakota fund to the department of commerce for department programs.  Of this amount, $500,000 is for the North Dakota tourism program, $1,000,000 is for discretionary funds, 
$1,500,000 is for entrepreneurship grants and vouchers
, and $500,000 is for providing a grant to the energy and environmental research center at the university of North Dakota.

S.B. 2018, § 14, 65th Legis. Assemb., Reg. Sess. (N.D. 2017) (emphasis added).  Section 14 states that $1.5 million for entrepreneurship grants and vouchers is funded by the research North Dakota fund.  The $1.5 million allocated for ‘entrepreneurship grants and vouchers’ corresponds directly with the five specific entrepreneurship grants and vouchers identified in Section 12:  $300,000 each to entrepreneurial centers in Bismarck, Fargo, and Grand Forks; $300,000 to an organization that provides workplace safety; and $300,000 for biotechnology grants.  Reading the bill as a whole, the plain language of Sections 12 and 14 identifies the funding source as the research North Dakota fund.

[¶27] The Legislative Assembly may not insulate an item from veto by including it within a larger appropriation, funding that larger appropriation from multiple special funds, or failing to identify the funding source for the item.  Here, it is plain which funds are allocated to which expenditures, so the itemized appropriations each satisfy the required specification of purpose, amount, and funding source.

[¶28] The Workplace Safety Veto was within the Governor’s item veto authority and the result of the veto is that the larger appropriation in which the item was included is as a matter of law reduced by the amount of the item.

B. Credit Hour Veto

[¶29] Senate Bill 2003, § 39, provides:

SECTION 39.  LEGISLATIVE INTENT - NORTH DAKOTA STATE UNIVERSITY - LEASE ARRANGEMENT AND OTHER SAVINGS.  It is the intent of the sixty-fifth legislative assembly that future general fund appropriations in support of the North Dakota state university department of nursing program in Bismarck be adjusted for savings resulting from facility lease negotiations 
and for credit-hours completed at the school
.

S.B. 2003, § 39, 65th Legis. Assemb., Reg. Sess. (N.D. 2017) (emphasis added).  Governor Burgum vetoed the language “and for credit-hours completed at the school.”  2017 N.D. Sess. Laws ch. 449.

[¶30] The Legislative Assembly argues that the Credit Hour Veto was unconstitutional because the Governor replaced its intent with his own intent.  The title of Section 39 states:  “SECTION 39.  LEGISLATIVE INTENT . . . .”  Further, Section 39’s opening words are, “It is the intent of the sixty-fifth legislative assembly that . . . .”  This section contains a single sentence, the entirety of which is a statement of the Legislative Assembly’s intent.  The Governor altered the stated intent by vetoing the phrase “and for credit hours completed at the school.”  We have not previously decided whether the item veto power is limited to items making appropriations and any accompanying conditions.  Senate Bill 2003 is an appropriation bill.  Section 39 is not a condition on an appropriation.  We assume without deciding that the Governor may veto “items 
in
 an appropriation bill,” N.D. Const. art. V, § 9 (emphasis added), that are not themselves items 
of
 appropriation.  
Olson
, 286 N.W.2d at 271 (acknowledging governors have vetoed provisions “other than merely money items of appropriation when substantive provisions were commingled with line items of appropriation in one bill”).  The item veto power does not authorize the Governor to veto any part of a statement of legislative intent.  The Legislative Assembly has the prerogative to state its intent in legislation without the Governor altering that statement by selectively removing portions.  Therefore, the Credit Hour Veto is ineffective and the bill became law with Section 39 unmodified by the attempted veto.

C. Any Portion Veto

[¶31] Senate Bill 2003, § 18, provides:

SECTION 18.  DICKINSON STATE UNIVERSITY - USES OF FUNDS.

. . . .

3. Dickinson state university may not discontinue 
any portion of
 its department of nursing academic program during the biennium beginning July 1, 2017, and ending June 30, 2019.

. . . .

S.B. 2003, § 18, 65th Legis. Assemb., Reg. Sess. (N.D. 2017) (emphasis added).  The Governor vetoed the language “any portion of.”  2017 N.D. Sess. Laws ch. 449.

[¶32] The Legislative Assembly argues that the Governor vetoed a condition of the appropriation to Dickinson State University.  The Governor now concedes the Any Portion Veto is ineffective.  As discussed above, the Governor may not withdraw a veto or otherwise concede it was ineffective.  A veto is complete and irrevocable upon return of the vetoed bill to the originating house.  N.D. Const. art V, § 9.  If effective, this veto would allow portions of the nursing program to be discontinued, contrary to the legislature’s intent that the appropriation be conditioned on the entire nursing program remaining intact.  The Any Portion Veto did not strike a sum of money, but only modified a condition on appropriated funds.  The Any Portion Veto was an unauthorized veto because Section 18 conditions funds to Dickinson State University on continuing its entire nursing program, and the Any Portion veto modified that condition.  The Any Portion Veto is ineffective and the bill became law with that section intact.

D. Water Commission Veto

[¶33] House Bill 1020, § 5, provides:

SECTION 5.  STATE WATER COMMISSION PROJECT FUNDING DESIGNATIONS - TRANSFERS - BUDGET SECTION APPROVAL.

1. Of the funds appropriated in the water and atmospheric resources line item in section 1 of this Act from funds available in the resources trust fund and water development trust fund, $298,875,000 is designated as follows:

a. $120,125,000 for water supply;b. $27,000,000 for rural water supply;c. $136,000,000 for flood control; andd. $15,750,000 for general water.

2. The funding designated in this section is for the specific purposes identified; however, the state water commission may transfer funding among these items, 
subject to budget section approval and upon notification to the legislative management’s water topics overview committee
.

H.B. 1020, § 5, 65th Legis. Assemb., Reg. Sess. (N.D. 2017) (emphasis added).  The Governor vetoed the language “subject to budget section approval and upon notification to the legislative management’s water topics overview committee.”  2017 N.D. Sess. Laws ch. 446.

[¶34] The Legislative Assembly argues that the Governor vetoed a condition on the appropriation of $298,875,000 to the water commission.  They contend that the veto would allow the water commission to use the entire amount of appropriated funds however it chooses, freely transferring between the designated purposes, which would render the original allocation by the legislature meaningless.  The Governor concedes that the Water Commission Veto is ineffective.  For the reasons discussed in section III(C), the Governor’s concession is of no effect.  This veto did not strike a sum of money.  Because Section 5, House Bill 1020, conditions the $298,875,000 appropriation on the approval of the budget section as to the transferring of funds among categories, and the Governor did not veto the $298,875,000 appropriation itself, the Water Commission Veto was unauthorized.  This veto is ineffective.

E. IT Project Veto

[¶35] Senate Bill 2013, § 12, provides:

SECTION 12.  INFORMATION TECHNOLOGY PROJECT - BUDGET SECTION APPROVAL - LEGISLATIVE INTENT - AGENCY EFFICIENCIES.  The capital assets line item and the total special funds line item in section 1 of this Act include $3,600,000 from the state lands maintenance fund for an information technology project. 
Of the $3,600,000, $1,800,000 may be spent only upon approval of the budget section
.  It is the intent of the sixty-fifth legislative assembly that during the 2017-18 interim, the governor and the commissioner of university and school lands achieve efficiencies and budgetary savings within the department of trust lands through the use of innovative ideas and through alternative solutions relating to information technology.

S.B. 2013, § 12, 65th Legis. Assemb., Reg. Sess. (N.D. 2017) (emphasis added).  The Governor vetoed the language “Of the $3,600,000, $1,800,000 may be spent only upon approval of the budget section.”  2017 N.D. Sess. Laws ch. 450.

[¶36] The Legislative Assembly argues that the Governor vetoed a condition on the appropriation of $3.6 million for an information technology project.  The Governor concedes that the IT Project Veto is ineffective.  For the reasons discussed in section III(C), the Governor’s concession is of no effect.  The veto did not strike an item of appropriation.  Because Section 12, Senate Bill 2013, conditions half of the $3.6 million appropriation on the approval of the Budget Section, and Governor Burgum did not veto the appropriation itself, the IT Project Veto was unauthorized.  The veto is ineffective.

IV.

[¶37] The Governor cross-petitions for a declaratory judgment stating that the budget section provisions of House Bill 1020 and Senate Bill 2013 are unconstitutional in violation of the non-delegation and separation of powers doctrines.  The Legislative Assembly argues that the Attorney General lacks standing to challenge the constitutionality of the budget section provisions and that those provisions are constitutional.

A.

[¶38] The Legislative Assembly argues that the Attorney General lacks standing to challenge the constitutionality of the budget section provisions of House Bill 1020 and Senate Bill 2013.  The Legislative Assembly concedes that the Governor has standing to challenge these provisions.  Because the issues raised and the relief requested by the Governor and the Attorney General are identical, we need not resolve whether the Attorney General has standing in his own right to bring the cross petition.

[¶39] The Legislative Assembly also argues that the Attorney General has a duty to defend state statutes against constitutional challenge and thus may not properly advocate on behalf of the Governor against the constitutionality of the budget section provisions as a result of this apparent conflict.  Among the duties of the Attorney General is to “[a]ppear and defend all actions and proceedings against any state officer.”  N.D.C.C. § 54-12-01(3).  Where state officers are opposing parties, “the attorney general may determine which officer the attorney general will represent.”  
Id.
  Although this issue was not addressed, we have once before permitted the Attorney General to argue against the constitutionality of a statute on behalf of a state official.  
Solberg v. State Treasurer
, 78 N.D. 806, 53 N.W.2d 49 (1952) (agreeing with the Attorney General’s argument on behalf of Treasurer that statute was unconstitutional).  The Attorney General has acknowledged a general duty to defend statutes against constitutional challenge.  Whatever may be the source for such a duty, where there is a conflict, the Attorney General’s overriding duty is to the Constitution he is sworn to support.  N.D. Const. art. XI, § 4.  We hold that the Attorney General is not precluded from representing the Governor in challenging the constitutionality of a statute.

B.

1.

[¶40] The North Dakota Constitution creates three branches of government and vests each branch with a distinct type of power.  N.D. Const. art. III, § 1 (“[T]he legislative power of this state shall be vested in a legislative assembly . . . .”); N.D. Const. art. V, § 1 (“The executive power is vested in the governor . . . .”); N.D. Const. art. VI, § 1 (“The judicial power of the state is vested in a unified judicial system . . . .”).  By vesting each branch with a distinct form of power, the Constitution keeps those powers separate.  The three branches are “coequal,” N.D. Const. art. XI, § 26, each “supreme in its own sphere.”  
State ex rel. Spaeth v. Meiers
, 403 N.W.2d 392, 394 (N.D. 1987).  Long before the express formalization of separation of powers in Article XI, § 26, this Court recognized that the Constitution’s apportionment of power among three branches implicitly excluded each branch from exercising the powers of the others.  
State v. Hanson
, 558 N.W.2d 611, 614 (N.D. 1996) (citing 
Glaspell v. City of Jamestown
, 11 N.D. 86, 88 N.W. 1023 (1902)); 
see also Miller v. French
, 530 U.S. 327, 341 (2000) (explaining that separation of powers doctrine “prohibits one branch from encroaching on the central prerogatives of another”).

[¶41] To reinforce this structural separation of powers and further prevent concentration of unchecked power in the individual officers or agents of the three branches, the Constitution provides that no sitting member of the legislature may hold any full-time appointive state office, N.D. Const. art. IV, § 6, nor may any judge or justice hold any office not judicial in nature, N.D. Const. art. VI, § 10.

[¶42] The essential structural division of power into three branches created by our Constitution parallels that of our sister states and also that of the U.S. Constitution.  Accordingly, we may find the decisions from the U.S. Supreme Court and the highest courts of our sister states persuasive, but ultimately we are charged with interpreting the North Dakota Constitution and its distinct provisions.  We have sometimes navigated our own path in defining the contours of separation of powers and non-delegation doctrine, 
see Glaspell v. City of Jamestown
, 11 N.D. 86, 88 N.W. 1023 (1902) (disagreeing with several state supreme courts on non-delegation question).

[¶43] Although the state and federal constitutions share the same structural division, the textual expression and the legal-historical context in which each was enacted differs.  As a result, we are not bound by the separation of powers decisions of the U.S. Supreme Court when considering analogous issues presented under the state constitution.  Rather, we consider these decisions as persuasive authority on principles of separation of powers, mindful that such principles are fundamental to the American system of government.

[¶44] The Governor raises two related arguments against the budget section provisions at issue in the Water Commission Veto and the IT Project Veto.  Both arguments implicate separation of powers concerns.  What the Governor labels as a violation of non-delegation encompasses those situations where one branch of government consents to the exercise of its power by another body.  An illustrative example is 
Nord v. Guy
, where we held the legislative branch had attempted to delegate its purely legislative power to the state board of higher education.  141 N.W.2d 395 (N.D. 1966).  What the Governor labels as a separation of powers violation encompasses those situations where one branch encroaches into the proper sphere of another branch without the consent of the other branch.  
See Patchak v. Zinke
, 138 S. Ct. 897, 904-05 (2018) (quoting 
Kilbourn v. Thompson
, 103 U.S. 168, 191 (1881)) (“Each branch ‘exercise[s] . . . the powers appropriate to its own department,’ and no branch can ‘encroach upon the powers confided to the others.’”).

[¶45] Our decisions distinguish between proper and improper delegations of power to executive branch agencies but refer to both as a “delegation.”  
Compare County of Stutsman v. State Historical Soc. of North Dakota
, 371 N.W.2d 321, 329 (N.D. 1985) (proper delegation), with 
Nord
, 141 N.W.2d at 404 (improper delegation).  The ordinary meaning of delegate is to “give part of one’s power or work to someone” or “empowering another to act as an agent or representative.”  
Black’s Law Dictionary
 519 (10th ed.) (definitions of delegate and delegation).  We deem a legislative grant of power to the executive to be proper when the executive’s policy-making discretion is constrained by “reasonably clear guidelines” and a “sufficiently objective standard,” 
County of Stutsman
, at 327-29.  The term “delegation” may tend to confuse rather than clarify in this context.  A proper grant of power to the executive is the result of a legislative act that creates in the executive branch the power to execute the new law.  
See Kelsh v. Jaeger
, 2002 ND 53, ¶ 21, 641 N.W.2d 100 (“When reasonable guidelines are given, the delegated power to ascertain facts for operation of a law is not unconstitutional, because that power pertains to execution of the law.”).

2.

[¶46] “Unless expressly authorized by the State Constitution, the Legislature may not delegate its purely legislative powers to any other body.”  
County of Stutsman
, 371 N.W.2d at 327; 
see also Kelsh
, 2002 ND 53, ¶ 23, 641 N.W.2d 100.  The Legislative Assembly may not delegate to another body the power to make law—to legislate—but it may bestow authority to execute the laws it enacts.  
Ralston Purina Co. v. Hagemeister
, 188 N.W.2d 405, 411 (N.D. 1971).  The modern view of the non-delegation doctrine “recognizes that, in a complex area, it may be necessary and appropriate to delegate in broad and general terms, as long as there are adequate standards and procedural safeguards.”  
North Dakota Council of School Administrators v. Sinner
, 458 N.W.2d 280, 285 (N.D. 1990) (rejecting non-delegation challenge to statutory budget allotment procedure).  “The power to ascertain certain facts which will bring the provisions of a law into operation by its own terms is not an unconstitutional delegation of legislative powers.”  
County of Stutsman
, at 327.  “However, the law must set forth reasonably clear guidelines to enable the appropriate body to ascertain the facts.”  
Id.

[¶47] In 
County of Stutsman
, the state historical board decided to place Stutsman County’s original courthouse on the state historical sites registry.  371 N.W.2d at 322-23.  Stutsman County opposed this determination.  
Id.
 at 323-24.  Under N.D.C.C. § 55-10-02(4), at the time, the board could designate sites to place on the registry if they possessed “historical value.”  
Id.
 at 324.  The board promulgated rules fleshing out criteria for historical value.  
Id.
 at 327-28.  Stutsman County argued that the legislature impermissibly delegated to the board the authority to define and determine whether a site has historical value.  
Id.
 at 326.  We upheld the legislature’s delegation because the term “historical value” provided “a sufficiently objective standard to advise ordinary and reasonable people as to its meaning and to limit the Board’s discretionary power to place sites on the Registry.”  
Id.
 at 328-29.

[¶48] In 
Nord
, we reviewed a statute which authorized the state board of higher education to provide facilities to be used for educational purposes at institutions of higher education.  141 N.W.2d at 396.  The legislature attempted to delegate to the board the power to determine which facilities were to be constructed at different institutions and the amount to be spent at each.  
Id.
 at 404.  We concluded, in part, that because the legislature did not set forth any rule guiding the board in these determinations, it unconstitutionally delegated its legislative authority.  
Id.

[¶49] In 
Kelsh
, we reviewed a statute providing that the senior incumbent senator may stop an election when two senators are placed in the same district upon redistricting.  2002 ND 53, ¶ 20, 641 N.W.2d 100.  The statute gave the incumbent an opportunity to run immediately in an election in his new district, advancing the incumbent senator’s private interest, rather than a public interest.  
Id.
  Because this statute gave unfettered discretion to the senior incumbent senator, the statute was an unconstitutional delegation of the legislative power.  
Id.
 at ¶ 23.

[¶50] In 
State ex rel. Judge v. Legislative Fin. Comm.
, the Supreme Court of Montana reviewed a statute empowering an interim legislative committee to approve budget amendments.  543 P.2d 1317, 1318-19 (Mont. 1975).  The court struck the statute down as an unconstitutional delegation of legislative power:

[T]he 1975 Montana Legislature in its enactment of S.B. 401 and H.B. 1 (Special session) empowering the Finance Committee to approve budget amendments delegated a power properly exercisable only by either the entire legislature or an executive officer or agency, to one of its interim committees.  Such a hybrid delegation does not pass constitutional muster.  The power in question here resides in either the entire legislative body while in session or, if properly delegated, in an executive agency.  Clearly the action of the Finance Committee does not constitute the action of the entire legislature.  Article V, Section 11, 1972 Montana Constitution.  Just as clear is the fact that Article V, Section 9, 1972 Montana Constitution, would disqualify these legislators from membership on the Finance Committee if it were an executive agency.  Therefore those sections of S.B. 401 and H.B. 1 (Special Session) empowering the Finance Committee to approve budget amendments are declared invalid as unconstitutional delegations of legislative power.

Id.
 at 1321.

[¶51] To answer the questions presented under these theories of legislative encroachment and improper legislative delegation, we must consider what are the defining characteristics of legislative and executive power.  “The power to make a law is legislative,” but the power to administer or execute the law “under the provisions of the law itself, as enacted by the Legislature,” is executive.  
Ralston Purina Co.
, 188 N.W.2d at 410-11.

[¶52] “The power to appropriate money is purely a legislative power.”  
Trinity Medical Center v. North Dakota Bd. of Nursing
, 399 N.W.2d 835, 841 (N.D. 1987) (quoting 
Wilder v. Murphy
, 56 N.D. 436, 218 N.W. 156, 159 (1928)).  An appropriation is the “setting apart from the public revenue of a definite sum of money for the specified object in such a manner that the officials of the government are authorized to use the amount so set apart, and no more, for that object.”  
Olson
, 286 N.W.2d at 268.  In the context of a legislative appropriation, the Legislative Assembly must specify (1) the amount, (2) the object or purpose for which the amount is authorized, and (3) the fund from which the amount is set apart.  In reviewing whether a legislative act meets these requirements, we determine whether it contains “reasonably clear guidelines to enable the appropriate body to ascertain the facts.”  
County of Stutsman
, 371 N.W.2d at 327.

[¶53] House Bill 1020, § 5, does not set forth any standard for the budget section to apply in deciding whether to permit the water commission to transfer funds.  The Legislative Assembly does not identify a standard in its brief.  Like the state board of higher education in 
Nord
, the budget section has no legislative guidance to constrain it.  The budget section has unfettered discretion to approve or reject the water commission’s request to transfer funding among the four specified categories.  A law that provides no safeguards against arbitrary action is a clear sign that the Legislative Assembly has improperly attempted to delegate legislative power.  
Montana-Dakota Utilities Co. v. Johanneson
, 153 N.W.2d 414, 421 (N.D. 1967) (“The Legislature must declare the policy of the law and must definitely fix the legal principles which are to control the action taken.”).  Because it lacked any guidelines, House Bill 1020, § 5, unlawfully delegated legislative authority to the budget section.  The budget section provision of House Bill 1020, § 5, is unconstitutional in violation of the non-delegation doctrine.

3.

[¶54] The failure to adequately constrain the budget section’s discretion is not the only constitutional flaw in H.B. 1020.  The Legislative Assembly could have provided detailed standards to the budget section for approving a transfer request, and a greater flaw would remain.  The Legislative Assembly was not attempting to delegate its core legislative power to the executive branch, but to retain control over executing a law after it is enacted by delegating power to a committee of its own members.

[¶55] After a law is enacted, further fact finding and discretionary decision-making in administering appropriated funds is an executive function.  
See State ex rel. McLeod v. McInnis
, 295 S.E.2d 633, 637 (S.C. 1982) (stating that administration of appropriations is the function of the executive branch).  In 
McInnis
, the Supreme Court of South Carolina reviewed legislation that provided for the creation of a joint appropriations review committee.  295 S.E.2d at 634.  The committee, composed of twelve legislators, was granted broad authority to control expenditure of state and federal funds. 
 Id.
 at 638.  The court held that the authority granted to the committee violated the separation of powers, concluding that the legislation would permit twelve legislators to control expenditures by administration rather than by legislation, creating a veto power in the committee.  
Id.
 at 638-39.

[¶56] In 
I.N.S. v. Chadha
, the U.S. Supreme Court reviewed the constitutionality of 8 U.S.C. § 1254(c)(2), which authorized either house of Congress to invalidate a decision of the Attorney General to allow a deportable alien to remain in the United States.  462 U.S. 919, 959 (1983).  The Court struck down this one-house legislative veto as unconstitutional because it violated the constitutional requirements of passage by a majority of both houses (bicameralism) and presentment to the President.  
Id.
 at 957-59.

The bicameral requirement, the Presentment Clauses, the President’s veto, and Congress’ power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps.  To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded.  To accomplish what has been attempted by one House of Congress in this case requires action in conformity with the express procedures of the Constitution’s prescription for legislative action:  passage by a majority of both Houses and presentment to the President.

Id.
 at 957-58.

[¶57] In 
Bowsher v. Synar
, the U.S. Supreme Court reviewed the Balanced Budget and Emergency Deficit Control Act of 1985, which sought to eliminate the federal budget deficit.  478 U.S. 714, 717 (1986).  If the budget deficit exceeded a certain amount, the Act required across-the-board cuts in federal spending.  
Id.
 at 717-18.  Deficit estimates and budget reduction calculations were submitted to the comptroller general, who in turn submitted a report to the President.  
Id.
 at 718.  The President then mandated the spending reductions specified by the comptroller general.  
Id.
  Thus, the comptroller general was given the “ultimate authority to determine the budget cuts to be made.”  
Id.
 at 733.  The Court held that Congress acted unconstitutionally:  “By placing the responsibility for execution of the Balanced Budget and Emergency Deficit Control Act in the hands of an officer who is subject to removal only by itself, Congress in effect has retained control over the execution of the Act and has intruded into the executive function.”  
Id.
 at 734.

[¶58] In 
Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.
, the U.S. Supreme Court reviewed federal legislation authorizing the transfer of operating control of two airports from the federal government to a local authority, conditioned on the creation of a review board by the local authority.  501 U.S. 252, 255 (1991).  The review board, composed of nine congressmen, had the ability to veto the decisions of the local authority.  
Id.
  The Court described the review board as “an entity created at the initiative of Congress, the powers of which Congress ha[d] delineated, the purpose of which [was] to protect an acknowledged federal interest, and membership in which [was] restricted to congressional officials.”  
Id.
 at 269.  The Court concluded that conditioning of the transfer upon creation of the review board was an “impermissible encroachment” on the executive branch, violating the separation of powers.  
Id.
 at 277.  In reaching this decision, the Court outlined two constraints on the legislature:  1) “It may not invest itself or its Members with either executive power or judicial power,” and 2) “when it exercises its legislative power, it must follow the single, finely wrought and exhaustively considered, procedures specified in Article I.”  
Id.
 at 274 (quotations omitted).

[¶59] These decisions are consistent with the separation of powers decisions interpreting the North Dakota Constitution.  “Under our constitutional system, the Legislature may not delegate to itself, or to a subset of its members, executive or judicial functions.”  
Kelsh
, 2002 ND 53, ¶ 21, 641 N.W.2d 100.  In its exercise of legislative power, it must follow the constitutionally mandated procedures, including a recorded vote of a majority of the members elected to each house followed by presentment to the governor for signature.  N.D. Const. art. IV, § 13; N.D. Const. art. V, § 9.  To do otherwise would violate the separation of powers.

[¶60] The budget section provision of House Bill 1020, § 5, requires budget section approval before any proposed transfer of funds by the water commission.  Thus, although the water commission has the power to propose a transfer from one designated category to another, the budget section has ultimate authority to accept or reject the transfer.  Similar to the joint appropriations review committee in 
McInnis
, the comptroller general in 
Bowsher
, or the review board in 
Metro. Wash. Airports Auth.
, the budget section maintains control over an important aspect of executing the law after the law’s enactment.  Here, that is the ability to transfer funds between budget categories, which changes the specified purpose of the appropriated funds.  The Legislative Assembly argues that the budget section performs only the “limited legislative function of gathering facts to ascertain whether certain funds may be transferred between the specified purposes established by the Legislative Assembly.”  The budget section may gather facts to make an informed decision in enacting legislation, but that is not what it does here.  It retains for itself discretion over this appropriation after enactment.  Once a bill is enacted, the Legislative Assembly may control the bill’s administration only indirectly through passing new legislation.  
Bowsher
, 478 U.S. at 733-34.  After enactment, that duty belongs to the executive branch, not a subset of the legislative branch.

[¶61] The budget section is composed of 42 members of the 141-member Legislative Assembly.  Under H.B. 1020, its decision to accept or reject the transfer of funds does not have to be passed by a majority of each house of the legislature, nor does it have to be presented to the Governor for signature.  The budget section decides whether to approve or reject transfers.  This retained control by an agent of the Legislative Assembly to continue directing expenditures after its role of passing legislation is completed is unconstitutional.  It encroaches upon the role of the executive, and also bypasses the mandatory legislative process.

[¶62] The dissent, at ¶ 79, characterizes the separation of powers violation as turning on giving one agency more leeway than another.  The separation of powers issue here is not how much discretion is given regarding expenditure of appropriations, but to whom the discretion is given after a bill is enacted.  In drafting legislation, the Legislative Assembly can provide broad or narrow discretion to the executive branch.  The Legislative Assembly violates separation of powers when it retains discretion after enactment for itself or its agent, the budget section.

[¶63] The Legislative Assembly argues that because it meets only biennially, flexibility is needed to “react to changing and unforeseen conditions between sessions.”  This justification does not extinguish the restrictions placed upon it by the Constitution.  As aptly put in 
Chadha
, “the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.  Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government . . . .”  462 U.S. at 944.

[¶64] The budget section provision of House Bill 1020, § 5, violates the required separation of powers and is unconstitutional as beyond the authority of the Legislative Assembly.

4.

[¶65] The Legislative Assembly argues that if the budget section provision of House Bill 1020, § 5, is stricken from the bill, the language granting the water commission authority to transfer funds among categories must also be stricken from the bill.  The Legislative Assembly argues that this would be consistent with its intent because it did not give the water commission unfettered authority to transfer funds from one category to another.  The Governor argues that striking the language which provides the water commission authority to transfer funds is an attempt by the Legislative Assembly to legislate through litigation.  The Governor contends that transfer authority language does not need to be stricken because what remains after striking the budget section condition is a workable piece of legislation.

[¶66] This Court has stated that “if a legislative act be in part unconstitutional, the valid portion shall stand, unless the result be one not contemplated or desired by the Legislature.”  
Olson
, 286 N.W.2d at 274.  While the remaining portion of the bill would be workable legislation without the budget section condition, it would not result in legislation that was contemplated or desired by the Legislative Assembly.  H.B. 1020, § 5, states that “the state water commission may transfer funding among these items, 
subject to budget section approval
 . . . .” (emphasis added).  The use of the conditional “subject to” shows that the Legislative Assembly purposefully conditioned funding transfers from the water commission upon approval of the budget section.  This language makes clear the Legislative Assembly did not intend a transfer of funds without the approval of its agent, the budget section.  Thus, the provision granting authority to the water commission to transfer funds is stricken.  The result is that only the following portion of H.B. 1020, § 5, subsection 2 remains:  “The funding designated in this section is for the specific purposes identified.”

[¶67] Striking the water commission’s ability to transfer funds is not, as the Governor suggests, legislation through litigation.  Having concluded the budget section provision unconstitutional, we ensure that the bill functions nearly as close as the legislature intended.  Here, we conclude that requires striking both the budget section approval condition and the transfer authority.  We do so with the knowledge that should the need to transfer funds become an emergency, under Chapter 54-16, N.D.C.C., the emergency commission may authorize the transfer of funds among the enumerated categories in H.B. 1020, § 5.

C.

[¶68] Senate Bill 2013, § 12, provides that of the $3.6 million allocated for an information technology project, $1.8 million “may be spent only upon approval of the budget section.”  The Governor argues that this is unconstitutional because it violates the non-delegation and separation of powers doctrines.  We agree.

1.

[¶69] The Legislative Assembly argues that the budget section performs only the “limited legislative function of gathering facts to ascertain whether certain funds will be made available for expenditure.”  Senate Bill 2013 provides the budget section with the ultimate authority to approve or disapprove the use of half of the $3.6 million appropriation passed by the full legislature.  The fact gathering that is properly a legislative function precedes final enactment of legislation that culminates with bicameral passage and presentment to the Governor.  Here, the asserted need for fact gathering is for the purpose of applying the enacted law, thus it is within the executive function of administering the appropriation.  
See
 
Kelsh
, 2002 ND 53, ¶ 21, 641 N.W.2d 100 (ascertaining facts for application to legislative guidelines pertains to execution of the law); 
see also
 
Bowsher
, 478 U.S. at 733-34; 
McInnis
, 295 S.E.2d at 637.  Convenience is no substitute for the mandatory legislative process.  By arrogating to itself, through a committee of its members, the power to administer appropriations, the Legislature has unconstitutionally encroached upon the executive and consolidated the power to both make and execute the laws into its own hands.  The budget section provision of Senate Bill 2013, § 12, violates the separation of powers.

2.

[¶70] The Legislative Assembly argues that this bill provides adequate standards by which the budget section can determine whether to approve additional spending for the IT project.  Section 12 provides, “It is the intent of the sixty-fifth legislative assembly that during the 2017-18 interim, the governor and the commissioner of university and school lands achieve efficiencies and budgetary savings within the department of trust lands through the use of innovative ideas and through alternative solutions relating to information technology.”  This statement of intent does not provide adequate standards.  It provides a general goal for the Governor and the commissioner of university and school lands to “achieve efficiencies and budgetary savings.”  It does not by its terms constrain the budget section in determining whether to approve the $1.8 million subject to its approval.  The budget section cannot objectively determine whether to approve the $1.8 million in conditional funding under such a guideline.  Stated as a broad goal of efficiency and budget savings, this guideline is implicit in every appropriation, for it is a duty of all public officials to efficiently use public funds entrusted to them.

[¶71] Here, the budget section lacks adequate guidance, leaving it discretion to approve or reject the use of the $1.8 million appropriated for an IT project subject only to the budget section’s subjective assessment of efficiency achieved or budget savings.  
See Sinner
, 458 N.W.2d at 286-87 (VandeWalle, J., concurring) (calling for closer review where delegation relates to appropriation rather than regulation).  A broadly worded appropriation granting discretion to the commissioner of university and school lands to spend an additional $1.8 million on an IT project if it serves the ends of budget savings and operational efficiency would be unremarkable.  That the discretion relates to an appropriation and is given to an agent of the Legislative Assembly is what draws particular scrutiny.  
See
 
Kelsh
, 2002 ND 53, ¶ 20, 641 N.W.2d 100.  Thus, the budget section provision of Senate Bill 2013, § 12, is unconstitutional as a violation of the non-delegation doctrine.

3.

[¶72] The Legislative Assembly argues that if the budget section provision of Senate Bill 2013, § 12, is stricken from the bill, the amount appropriated must be reduced from $3.6 million to $1.8 million because it did not intend for the commissioner of university and school lands to spend the entire $3.6 million.  Although we agree the budget section provision is a condition on $1.8 million of the appropriated amount, it is less clear whether appropriating the full $3.6 million is a result that the legislature “contemplated or desired.”  
See Olson
, 286 N.W.2d at 274.  We explain below that the full appropriation must stand.

[¶73] In Section 1, S.B. 2013, the Legislative Assembly appropriated $3.6 million for capital assets.  Section 3, S.B. 2013, provided that the $3.6 million is for an information technology project.  Section 12, S.B. 2013, provides, “The capital assets line item and the total special funds line item in section 1 of this Act include $3,600,000 . . . for an information technology project.”  It is not until the second sentence of Section 12 that the Legislative Assembly conditions half of $3.6 million on approval of the budget section.  The Legislative Assembly argues that each of these sections needs to be altered to reflect $1.8 million being appropriated, instead of $3.6 million.  We decline to make such alterations, because the judicial branch is no more empowered to add words to a statute than is the executive branch.  The result of striking the budget section provision is that S.B. 2013 appropriates $3.6 million to the commissioner of university and school lands.  The Legislative Assembly must have contemplated this result because the commissioner was provided the authority to spend the entire amount on the IT project without guidelines for the budget section to apply in halting the project after expending half of the appropriated funds.  Thus, we decline to strike any provisions of S.B. 2013, other than the budget section provision.  With the stricken language removed, S.B. 2013, § 12, reads:

SECTION 12.  INFORMATION TECHNOLOGY PROJECT - BUDGET SECTION APPROVAL - LEGISLATIVE INTENT - AGENCY EFFICIENCIES.  The capital assets line item and the total special funds line item in section 1 of this Act include $3,600,000 from the state lands maintenance fund for an information technology project.  It is the intent of the sixty-fifth legislative assembly that during the 2017-18 interim, the governor and the commissioner of university and school lands achieve efficiencies and budgetary savings within the department of trust lands through the use of innovative ideas and through alternative solutions relating to information technology.

V.

[¶74] For the reasons stated above, we exercise our original jurisdiction by granting the petition in part, denying it in part, and granting the cross-petition.  All claims presented are justiciable controversies.  The Workplace Safety Veto is valid and effective.  The Credit Hour Veto, Any Portion Veto, Water Commission Veto, and IT Project Veto are ineffective, causing the bills to have been enacted in their entirety.  The Governor has standing to bring the cross-petition, and the Attorney General may advocate on the Governor’s behalf.  The budget section provision of House Bill 1020, § 5, is unconstitutional as an improper delegation and violation of separation of powers, and the provision providing the water commission the authority to transfer funds among categories is also stricken.  The budget section provision of Senate Bill 2013, § 12, is unconstitutional as an improper delegation and violation of separation of powers, and the budget section condition is stricken.

[¶75] Jerod E. Tufte

Jon J. Jensen

VandeWalle, Chief Justice, concurring and dissenting.

[¶76] I concur in the result reached by the majority opinion in part II and much of part III of the opinion, with the understanding that not every bill or part thereof which contains a dollar sign or refers to an amount of money is an appropriation.  While I understand the discussion relative to the Legislative Drafting Manual, there is much to be said about the legislative branch following and the executive and judicial branches accepting a format that clearly defines an appropriation.

[¶77] With respect to part III C, labeled “Any Portion Veto” regarding SB 2003, Governor Burgum concedes the invalidity of his veto.
(footnote: 1)
[¶78] With respect to the Governor’s cross-petition, I agree with that portion of Part IV of the opinion holding the bills unconstitutional as violating the non-delegation-of-

legislative-authority doctrine because in delegating its authority, the legislature did not provide adequate standards to the budget section.  However, I respectfully dissent to that portion of Part IV of the opinion and its extensive discussion and holdings under the doctrine of separation of powers.  I do so because 1) it is unnecessary to our decision, and 2) I am not convinced the delegation to the budget section, if proper standards were in place, would violate that doctrine.

[¶79] The Governor and Attorney General do not question the legislative authority to appropriate moneys in line items without granting the executive branch the authority to transfer funds among those line items.  Thus, most executive branch agencies have no authority to transfer among line items.  As the majority opinion notes, in case of emergency the agencies may request that authority from the Emergency Commission.  In addition, the Water Commission is authorized to apply to the Budget Section for authority to transfer funds without an emergency existing.  While I agree that without proper guidelines established by the legislature, it is an unconstitutional delegation of legislative authority to the budget section.  It seems odd to me that giving one executive branch agency more leeway in spending appropriated funds than the other executive branch agencies violates the separation-of-powers doctrine.  It appears that the majority opinion adopts an “all or nothing” approach, i.e., the legislature may appropriate funds with no further oversight or it may deny expenditure authority.  While some of the cases cited by the majority may appear to support that position, they may be distinguished because they involve legislation that would prohibit expenditures without a subset of the legislature approving such expenditures.  And, in any event, decisions from other jurisdictions, while they may be persuasive, are not binding precedent on this Court.  I am not persuaded.  Here, we are not concerned with authority in the budget section to prohibit expenditure of funds but rather the authority to transfer funds from one line item to another.

[¶80] While we hold that unbridled authority to be an unlawful delegation of legislative powers, I am unwilling at this time to conclude it also violates the principles of separation of powers.

[¶81] Gerald W. VandeWalle, C.J.

Crothers, Justice, concurring and dissenting.

[¶82] I concur in the result reached by the majority and agree with much of what they have written.  I respectfully dissent from Part IV(B)(3) deciding that the portion of H.B. 1020, 65th Legislative Assembly (N.D. 2017), challenged by the Governor violates the separation of powers doctrine.

[¶83] The Governor challenged the constitutionality of budget section provisions in H.B. 1020, 2017 N.D. Sess. Laws ch. 19, § 5, by claiming they violated the non-delegation and separation of powers doctrines.  Majority, at ¶ 44.  All members of this Court agree H.B. 1020, § 5, unconstitutionally delegates legislative authority to the budget section.  
Id.
 at ¶ 53.  After reaching that conclusion, the majority proceeds to address whether H.B. 1020, § 5, also violates the separation of powers doctrine.  
Id.
 at ¶ 54 (“The failure to adequately constrain the budget section’s discretion is not the only constitutional flaw in H.B. 1020.”).  I believe the constitutional analysis should have stopped after the non-delegation holding.

[¶84] Concepts of judicial restraint and abstention require that courts first consider whether the pending question can be resolved without constitutional analysis.  
See
 
Hosp. Servs., Inc. v. Brooks
, 229 N.W.2d 69, 71-72 (N.D. 1975) (noting courts examine claims on non-constitutional grounds before approaching any constitutional issues).  Otherwise stated:

“In 
Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering
, 
P.C.
, 467 U.S. 138, 157 (1984), the United States Supreme Court said, ‘It is a fundamental rule of judicial restraint, however, that this Court will not reach constitutional questions in advance of the necessity of deciding them.’  Seeking to avoid the necessity of deciding the constitutional question, the high court said, ‘The same prudential rule is properly employed in this case’ and remanded the case to this Court for an additional determination.  
Id.
 at 158-59.  Further, in cases involving statutes and constitutionality, the doctrine of abstention absent necessity of deciding unresolved constitutional issues goes to the very heart of the constitutional system of separation of powers.  Parties may want courts to decide unresolved constitutional questions, but not doing so unnecessarily is a jurisprudential rule—like the requirements of jurisdiction and finality—which courts have a duty to apply regardless of whether they have been raised by a party.
”

Barrios-Flores v. Levi
, 2017 ND 117, ¶ 35, 894 N.W.2d 888 (Sandstrom, J., dissenting) (internal citation omitted).

[¶85] Where, as here, the question necessarily involves constitutional analysis, deference to the work of our co-equal branches of government requires that we proceed with great caution and circumspection.  This Court has described our restraint in reviewing the constitutionality of statutes, stating,

“As a general rule a court will inquire into the constitutionality of a statute only to the extent required by the case before it and will not anticipate a question of constitutional law in advance of the necessity of deciding it, and will not formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.”

State v. King
, 355 N.W.2d 807, 809 (N.D. 1984) (citing 
Tooz v. State
, 76 N.D. 599, 599, 38 N.W.2d 285, 287 (1949)).

[¶86] In the present case the non-delegation basis is narrower than the separation of powers grounds because the former usually can be fixed through more artful legislative drafting while the latter tends to implicate the structure of governance.  Thus, the narrower grounds for considering the validity of H.B. 1020, § 5, is a determination whether the budget section provision contains a constitutionally excessive delegation of legislative authority.  We have done just that, after which we should stop further analysis.  
See
 
Plaut v. Spendthrift Farm, Inc.
, 514 U.S. 211, 217 (1995) (courts must decide the “narrower ground for adjudication of the constitutional questions in the case” and then end their analysis); 
Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm’n
, 149 F.3d 679, 688 n.5 (7th Cir. 1998) (“[I]t is a proper exercise of judicial restraint for courts . . . to decide constitutional attacks on the narrowest possible grounds and to avoid reaching unnecessary constitutional issues.”).

[¶87] Daniel J. Crothers

Lisa Fair McEvers

Gerald W. VandeWalle, C.J.

FOOTNOTES
1:    
The Governor and Attorney General do not contest the validity of the provision restricting Dickinson State University from discontinuing “any portion” of its nursing program as being a form of violation of separation of powers in light of Article VIII, § 6 (6)(b) of the North Dakota Constitution which provides in part:  “The said state board of higher education shall have full authority over the institutions under its control with the right, among its other powers, to prescribe, limit, or modify the courses offered at the several institutions.”